UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

REIS, INC. and REIS SERVICES, LLC,

                              Plaintiff,

        -against –

Ron Gershoni, Bradley Stedem, Dan Gershoni, and
JOHN DOE subscribers assigned IP addresses
199.48.225.86, 199.48.226.86, 199.48.228.86,
199.48.229.86, 199.48.231.86, 207.126.86.2, 207.126.87.2,
207.126.88.2, 207.126.89.2, 207.126.91.2, 207.126.92.2,
207.126.93.2, 207.126.94.2, 207.126.95.2, 204.45.133.146,
204.45.158.210, 66.90.101.97, 66.90.73.44, 71.105.235.7,
75.85.165.77, 67.83.54.209, 23.27.206.2,

                              Defendants.

15 Civ. 1442 (JMF)

**AMENDED COMPLAINT**

        Plaintiffs Reis, Inc. and Reis Services, LLC (together, "Reis") allege upon knowledge as to themselves and their own actions and on information and belief as to all other matters as follows:

<u>**Nature of the Action**</u>

        1.      This is an action for data piracy and related torts brought under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq*. and state law.  Reis maintains a proprietary subscription database (the "Reis Database"), for access to which it charges authorized users pursuant to various subscription agreements.  Defendants used misappropriated login credentials to access the Reis Database.

        2.      Defendants Ron Gershoni and Bradley Stedem (the "Consultant Defendants") were authorized to access the Reis Database in their capacity as consultants for a legitimate Reis subscriber, but they stole and misappropriated these credentials, giving them to unauthorized users in order to allow these persons to access the Reis Database without paying the fees that

Reis charges its legitimate customers.  These users (the "Unauthorized User Defendants") were initially anonymous, identified only by their IP addresses.  Dan Gershoni, Ron Gershoni's brother, is the only Unauthorized User Defendant identified to date.

3.      Together, both the Consultant Defendants and the Unauthorized User Defendants have stolen thousands of Reis commercial analytic reports.  These are reports that Reis's legitimate users pay tens, and sometimes hundreds, of thousands of dollars in annual subscription fees to obtain.

4.      Reis initially filed this action solely against the Unauthorized User Defendants, who at the time were identified only by otherwise-untraceable ranges of internet addresses.  At the time of the initial complaint, Reis did not know whether the Consultant Defendants were witting accomplices in the Unauthorized User Defendants' theft or themselves victims of the Unauthorized User Defendants' misappropriation.

5.      After the Court allowed Reis to subpoena the Consultant Defendants, they represented through counsel that Defendant Dan Gershoni, Ron Gershoni's brother, was an Unauthorized User Defendant (originally referred to as a John Doe Defendant).  Counsel's representation made clear that Dan Gershoni worked in concert with Ron Gershoni and Brad Stedem to make unauthorized use of Reis's proprietary data and databases.

6.      Because the data indicates that there are other Unauthorized User Defendants besides Dan Gershoni, Reis continues to name as "John Doe" defendants the person(s) or entit(ies) associated with the IP addresses known to have accessed the Reis Database using Gershoni and Stedem's login credentials.

**Background**

7.      The "Reis Database" has been developed and maintained by Reis through its extraordinary investments, efforts, and creativity over the last 34 years.  Reis, Inc. is a public company that is a leader in providing up-to-date commercial real estate market information and analysis.  The Reis Database contains detailed information on commercial properties in 275 of the largest metropolitan markets and over 7,000 discrete neighborhoods throughout the United States.

8.      A recent investigation conducted by Reis's Compliance Group has revealed substantial unauthorized use of the Reis Database — including downloading over 34,000 copies of reports from the Reis Database — services with a retail value of $16 million or more.

9.      Through an investigation of unusual data access and download patterns by one or more users located at Internet Protocol ("IP") addresses 199.48.225.86, 199.48.226.86, 199.48.228.86, 199.48.229.86, 199.48.231.86, 207.126.86.2, 207.126.87.2, 207.126.88.2, 207.126.89.2, 207.126.91.2, 207.126.92.2, 207.126.93.2, 207.126.94.2, 207.126.95.2, 204.45.133.146, 204.45.158.210, 66.90.101.97, 66.90.73.44, 71.105.235.7, 75.85.165.77, 67.83.54.209, 23.27.206.2 (the "Doe IP addresses") assigned by various Internet Service Providers ("ISP") and/or web hosting services and located in California, Colorado, Illinois, New York, and Texas, Reis has discovered that from at least July 2011 through September 2014, Defendants have downloaded 3,624 reports with a retail value of $3,604,230 without providing any compensation whatsoever to Reis.

10.      The Unauthorized User Defendants, including Dan Gershoni, wrongfully used one or more sets of misappropriated login credentials assigned to the Consultant Defendants. The credentials were issued to a well-known national financial institution that is a licensed Reis

account holder ("Subscriber A"), for which Ron Gershoni and Bradley Stedem have consulted in the past.

11.     In the past, Ron Gershoni and Bradley Stedem had accessed the Reis Database from a particular "block" or "range" of IP addresses that was publicly associated with Subscriber A.  The Unauthorized User Defendants, however, accessed the Reis Database from a completely different block of IP addresses. The sustained and simultaneous use of these credentials from different blocks of IP addresses confirms that the use was not authorized.

12.     By using unauthorized login credentials, Dan Gershoni and the Unauthorized User Defendants have been able to access, download, and use reports from the Reis Database without paying either (i) the *a la carte* retail prices for the reports that are charged to non-subscribers who wish to buy reports or (ii) a subscription fee required to take an annual license from Reis.  Defendants have thus stolen, or helped steal, over $3.6 million worth of reports from Reis.  This action seeks to hold them accountable for that misconduct.

## Parties

13.     Plaintiff Reis, Inc. is a Maryland corporation with its principal place of business in New York, New York.  Reis provides commercial real estate market information and analytical tools to real estate professionals through its subsidiary, plaintiff Reis Services, LLC.

14.     Plaintiff Reis Services, LLC is a Maryland limited liability company with its principal place of business in New York, New York.

15.     On information and belief, Defendant Ron Gershoni is a resident of Colorado.

16.     On information and belief, Defendant Bradley Stedem is a resident of New Jersey.

17.     On information and belief, Defendant Dan Gershoni is a resident of New Jersey.

18.     The remaining Unauthorized User Defendants, identified herein by their Doe IP addresses, are individuals and/or entities whose identity is presently unknown.  Despite diligent investigation, Reis is currently unaware of these Defendants' identity.  In particular, subpoenas to their Internet Service Providers have not resulted in responsive information.

## Jurisdiction and Venue

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367.

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).  A substantial part of the alleged events giving rise to the claim occurred in this District and a substantial part of the property that is the subject of this action is situated in this District.

## Factual Allegations

**Reis's Business and the Reis Database**

21.     Reis (including its predecessors) was founded in 1980 and is recognized by the real estate industry and the business and trade press as one of the premier sources of objective, timely, and granular market information.  This reputation was built by hard work and investment.  Significantly, Reis's work is particularly valued because of its objectivity:  Reis is independent of property owners and developers, and it does not compete as a broker in the listings space.

22.     The Reis Database contains information on apartment, office, retail, warehouse/distribution, flex/research and development, self-storage and seniors housing properties, and is used by real estate investors, lenders, and other professionals to make informed buying, selling, and financing decisions.  In addition, Reis reports are used by debt and equity investors to assess, quantify, and manage the risks of default and loss associated with individual mortgages, properties, portfolios, and real estate backed securities.  Reis's products are designed

to meet the demand for timely and accurate information to support the decision-making of its customers.

23.     To maintain its position as a market leader, Reis continually invests in the databases, technologies, intellectual capital, and personnel (including over 200 employees) critical to supporting the ever-increasing information needs of commercial real estate professionals.  Without access to the proprietary information developed and maintained by Reis, it would be incredibly burdensome, expensive, and time-consuming for a licensee (or other interested professional) to obtain equivalent in-depth information.  Most professional real estate investors do not want to devote the resources to creating an in-house infrastructure capable of performing this work, which is why they subscribe to Reis's services.

24.     Reis offers a variety of product delivery services that cater to the needs of different types of users.  They include *Reis SE*, its flagship delivery platform aimed at larger and mid-sized enterprises; *ReisReports*, aimed at other professional consumers and smaller enterprises; and *Mobiuss Portfolio CRE*, or *Mobiuss*, aimed primarily at risk managers and credit administrators at banks and non-bank lending institutions.  It is through these products that Reis provides online access to the Reis Database.

25.     In addition, Reis continues to develop and introduce new products, expand and add new markets and data, and find new ways to deliver existing information to meet client demand.  The depth and breadth of Reis's data and expertise are critical in allowing Reis to grow its business.   To maintain its position, Reis continuously expends substantial additional investments and efforts to maintain and improve its offerings and ensure their currency.

**Subscriptions to the Reis Database**

26.    Reis offers users a choice between *a la carte* (pay-as-you-go) access to the Reis Database and subscription-based access.   Both involve fee-based access pursuant to a license agreement with Reis.   Reports from the Reis Database are made available in six ways, with pricing reflective of the level of content being purchased:

- annual and multi-year subscriptions to *Reis SE* ranging in price from $1,000 to over $1,000,000, depending upon the subscriber's line of business, the number of subscriber employees licensed to use the service, the anticipated frequency of access and the combination of markets, property types, and reports subscribed to, for which the subscriber is typically allowed to download an unlimited number of reports over the subscription period in return for the up-front commitment to a fixed annual fee;

- annual and multi-year subscriptions to *Mobiuss* typically ranging in price from the low tens of thousands of dollars into the hundreds of thousands of dollars;

- capped *Reis SE* subscriptions ranging in price from $1,000 to $25,000, allowing clients to download content up to a ceiling defined by contractually agreed maximum retail value of reports over a particular period of up to twelve months;

- subscriptions to *ReisReports*, which are charged to a credit card, having a retail price ranging up to $150 per month (monthly or annual pricing options are available);

- custom data deliverables ranging in price from $1,000 for a specific data element to hundreds of thousands of dollars for custom portfolio valuation and credit analysis; and

- individual reports, which can be purchased with a credit card, having retail prices up to $999 per report and are available to anyone who visits Reis's retail web site or contacts

Reis via telephone, fax or email.  However, certain reports are only available with an annual subscription or capped subscription account.

27.     Reis provides its information services to many of the nation's leading lending institutions, equity investors, brokers, and appraisers, which pay fees of up to several hundred thousand dollars a year in order to use the Reis Database.

28.     As of June 30, 2014, Reis had 1,024 enterprise subscribers under signed contracts for its core *Reis SE* product.  A subscribing entity may have one or many users entitled to access *Reis SE*.  The number of users is a negotiated term of the contract, with higher prices generally charged to those subscribers who want more of their employees to have access.  In addition to these enterprise subscribers, there are other users who pay for individual reports by credit card, subscribers to the *ReisReports* product, and additional users of information available on third party platforms through Reis's data redistribution relationships.

29.     The vast majority of Reis's subscribers have utilized its core product for many years.

**Access to the Reis Database**

30.     The Reis Database is firewall protected.  Access to the Reis Database is by secure password and can be customized to accommodate the coverage, property type, and analytical needs of subscribers, providing access only to those portions of the database that the subscriber has paid to see.  To protect its proprietary rights, Reis also relies on, among other things, restrictive license agreements with subscribers.

31.     When a company enters into a license agreement with Reis, it may obtain licenses for an agreed number of employees or other users associated with the company.  Each individual

user is then issued his or her own login credentials consisting of a unique username and password to access the Reis Database.

32.    Users are not allowed to share passwords with other colleagues who work for a subscriber, much less with third parties.  Nor may they take their login credentials to new employers if they cease working for the subscriber.  Reis's Terms of Service, found on its website at https://www.reis.com/terms-of-service, and attached in substantially similar form to its subscriber agreements, including the agreement governing Subscriber A and its consultants (the "Subscriber A Agreement"), explicitly prohibit its licensees to "resell or transfer ... use of or access to" the Reis Database and elsewhere states that "[t]ransfer or assignment of your password and user name to another individual is strictly prohibited."

33.    All users of the Reis Database, whether subscribers or first time consumers, agree to be bound by the "terms, conditions, and notices contained" in the Terms of Service, and use of the Reis Database indicates acceptance of the Terms of Service.  The terms require, among other things, payment of fees for use of the Reis Database and obligate users to refrain from acting "in such a manner" as to deprive Reis of a "loss of a potential sale or subscription."

34.    Reis    also    maintains    an    Anti-Piracy    Policy    on    its    website    at https://www/reis.com/anti-piracy-policy, which defines "piracy" as "using our service without a license to do so, enabling or trying to enable a third party who is not authorized to use our service to use our service, or exceeding the scope of the uses permitted you under a license agreement between you and Reis."

35.    Links to Reis's Terms of Service and Anti-Piracy Policy are clearly labeled on the sign in page of the Reis Database under the heading "LEGAL," which is prominently displayed merely one inch below the sign in fields.  These links put users on notice that their access and

use of the Reis Database are subject to the Terms of Service.  A screen shot of the login page is provided here:



36.    When authorized Reis Database users leave or are otherwise dissociated from Reis's subscribers, the Terms and Conditions incorporated into Reis's subscription agreements require the subscribers to notify Reis.  This allows Reis to disable the departed employee's login credentials and at the subscriber's request, issue new ones to another employee instead.

**Patterns of Unauthorized Activity**

37.    Reis's Compliance Group recently uncovered patterns of activity where login credentials assigned to individuals at a company are being used repeatedly and for long periods of time from the Doe IP addresses.

38.    Specifically, Subscriber A, a well-known financial institution, is a long term customer of Reis with a license to provide access to many of its employees and consultants,

including Consultant Defendants Ron Gershoni and Bradley Stedem.  From July 2011 through September 2014, the login credentials assigned to these two consultants were used repeatedly to access and download a huge volume of reports from the Reis Database from the Doe IP addresses, located in California, Colorado, Illinois, New York, and Texas.  The sustained, simultaneous access of the Reis Database from multiple blocks of IP addresses is consistent with someone either sharing his or her login credentials with, or having them stolen by, another person who then accessed the system without a license and without paying for the reports obtained.

39.    Reis's investigation concluded that Ron Gershoni and Bradley Stedem's login credentials have been used on at least 119 and 61 different IP addresses in the past three years, respectively.   Both consultants' login credentials were used simultaneously from multiple locations.  The usage patterns, download activity, high volume of consumption, location of downloads, and simultaneous downloads indicates piracy in support of multiple and separate businesses distinct from Subscriber A.

40.    In addition, the login credentials assigned to Ron Gershoni and Bradley Stedem have appeared often in "Stairstep" patterns on at least four IP blocks or ranges, indicating pirated use of the Reis Database.  A "Stairstep" is a common pattern of unauthorized access that Reis has often observed in these cases:  (i) an individual uses one set of misappropriated login credentials from an IP address or range of addresses for a period of time, (ii) usage on that IP address or range of addresses ceases when that set of login credentials is deactivated by Reis (or the person ceases using that set of login credentials for another reason, including being instructed by the rightful user to stop using his or her credentials), and (iii) the individual begins accessing

the Reis Database on the same IP address or range of addresses via a different set of misappropriated login credentials.

41.     Although the identity and location of an IP user can often be ascertained through a "reverse lookup" of an IP address using various brand protection and cybercrime investigation tools, here, the Doe IP addresses track back only to various ISP providers and/or web hosting services – Ugotfile Inc.; Net Asset/Coldrack, Inc.; FDCservers.net LLC; Verizon Online, LLC; Time Warner Cable Inc.; Optimum Online; Energy Group Networks LLC— and appear to have been located in at least five different states, California, Colorado, Illinois, New York, and Texas. To date, Reis has only been able to identify Dan Gershoni as one of the Unauthorized User Defendants.  The remaining Unauthorized User Defendants, if any, cannot be identified without further discovery.

42.     None of the Doe IP addresses belong to Subscriber A, and the Unauthorized User Defendants, working in concert with Ron Gershoni and Bradley Stedem, have accessed and used proprietary reports from the Reis Database without authorization.

43.     Based on an analysis of automatically-maintained records of login attempts and report downloads, Reis has determined that over three thousand unauthorized, but successful, incursions into the Reis Database have occurred over a period of more than three years from computers bearing the Does' IP addresses, resulting in the downloading of 3,624 reports with a retail value of $3,604,230.

44.     Upon information and belief, Defendants' unauthorized intrusions into the Reis Database were knowing and willful because Defendants knew that the Unauthorized User Defendants were not employed by Subscriber A or otherwise authorized to use Reis credentials; knew that the Unauthorized User Defendants had not paid for access to the Reis Database; knew

that the Unauthorized User Defendants did not have a license to use the Reis Database; and were on notice from the Terms of Service posted on the database that login credentials are non-transferable.

45.     Upon information and belief, the Unauthorized User Defendants, acting in concert with Ron Gershni and Bradley Stedem, have accessed, downloaded, and used Reis's reports without compensating Reis, and as a result, have damaged Reis by preventing Reis from collecting its customary charges for access to its database, fully exploiting its licensing opportunities, and causing Reis to devote time, money, and valuable resources to maintain the security of its database for licensees and paying customers.

46.     Reis has suffered damages as a result of Defendants' unauthorized access, downloading, and use of proprietary reports from the Reis Database.

## Count I
## Violation of Computer Fraud and Abuse Act, 18 U.S.C. § 1030
## (All Defendants)

47.     Reis repeats and realleges the allegations of Paragraphs 1–46 of this Complaint as if fully set forth herein.

48.     The Reis Database consists of servers and computers that are used in interstate commerce, and comprise a "protected computer" as that term is used in 18 U.S.C. § 1030(e)(2)(B).

49.     Reis has maintained and secured the Reis Database by reasonable means at all relevant times.

50.     The Unauthorized User Defendants intentionally accessed Reis's protected computer without authorization or in excess of authorized access and thereby obtained

proprietary data and information services from the Reis Database. *See* 18 U.S.C. § 1030(a)(2)(C).

51.    The Unauthorized User Defendants knowingly and with intent to defraud, accessed Reis's protected computer without authorization or in excess of authorized access and by means of that conduct furthered the intended fraud and obtained proprietary data and information services from the Reis Database with a retail value of $3,604,230. *See* 18 U.S.C. § 1030(a)(4).

52.    The Unauthorized User Defendants intentionally accessed Reis's protected computers without authorization, in violation of 18 U.S.C. § 1030(a).

53.    Consultant Defendants conspired with the Unauthorized User Defendants to effect this unauthorized access, in violation of 18 U.S.C. § 1030(b).  Consultant Defendants took concerted action, with the Unauthorized User Defendants, to participate in a series of unlawful acts.  Each Consultant Defendant performed one or more overt acts pursuant to and in furtherance of the common scheme.

54.    As a result of Defendants' conduct, Reis has suffered losses in attempting to protect its rights against unauthorized access, downloading, and use of data and information stored in the Reis Database and in expending time, money, and resources (aggregating at least $5,000 in value) to conduct an investigation into the intrusion and a damages assessment.

55.    Determining the identity of a suspicious user is an essential part of Reis's damage assessment because the only way to determine whether a loss has occurred is to identify the user and determine whether it is acting pursuant to a duly issued license either by way of a Reis Subscriber Agreement or as a registered user paying for reports as they are accessed and downloaded from Reis.com.

56.     As part of the on-going investigation of the Unauthorized User Defendants' anonymous access and use of the Reis Database, Reis developed its own proprietary investigatory software at a cost of $76,364 in hourly wages of Reis developers from June 2014 through May 2015.

57.     The development of this software included many enhancements and fixes as Reis continued to investigate intrusions into its computer system by the Unauthorized User Defendants and others.  This process was necessary to keep up with the methods of persons like the Unauthorized User Defendants which seek to mask access and use of the Reis Database from Reis's view by using credentials issued to legitimate Reis licensees from locations that are not readily traceable to them.

58.     Had the Reis developers not been working on this proprietary investigatory software tool, they would have been working to enhance and improve the Reis Database and the services provided to Reis clients.

59.     The role of this software is to investigate and identify suspicious patterns of usage of Reis's computers when such patterns are found, they are further investigated by persons in the Reis Compliance Group at a substantial cost to Reis to determine whether the usage is licensed or not.

60.     This software has been used to investigate unauthorized intrusions into the Reis Database, including specifically that of the Unauthorized User Defendants.  This proprietary investigatory software was, in fact, instrumental in identifying the usage on the Doe IP Addresses as being unauthorized.

61.     In addition, Reis's Vice President of Product Development and Intellectual Property spent on average $4,900 per month of time in 2014 and 2015 using this investigatory

software tool to identify piracy, which included the ongoing unauthorized access to, and use of, the Reis Database by the Unauthorized User Defendants.  The value of the Reis employees' time in investigating the Unauthorized User Defendants' access and use of Reis's computer system from the Doe IP Addresses exceeded $5,000 in one calendar year.

62.    The process of investigating the Doe IP Addresses' usage to determine that it was unauthorized and indeed is attributable to the Unauthorized User Defendants extended over many months and included not only substantial time and expense incurred by Reis's in-house Compliance Group, but also included time and expense incurred by outside counsel which assisted in the effort to determine whether the Doe IP Address usage was authorized.

63.    The value of outside counsel's time incurred with respect to the investigation of the Doe IP Addresses exceeded $5,000 in one calendar year.

64.    Reis has also suffered economic damages in the amount of the lost retail value of the reports taken by Defendants without a license in an amount to be determined at trial, but which is in excess of $3,604,230.

65.    Reis has also suffered damage to its business and goodwill in an amount to be determined at trial.

66.    Reis is therefore entitled to compensatory damages under the CFAA.

**Count II**
**Breach of Contract**
**(Consultant Defendants)**

67.    Reis repeats and realleges the allegations of Paragraphs 1–66 of this Complaint as if fully set forth herein.

68.    The Consultant Defendants' use of the Reis Database is governed by and subject to the Subscriber A Agreement, which incorporates the Terms of Service for use of the Reis

Database.  In addition, at all relevant times, Reis prominently displayed a link to the Terms of Service on the sign in page of the Reis Database.

69.     Both the Subscriber A Agreement and the Terms of Service prohibit authorized users from sharing Reis login credentials or access to the Reis Database.  The Subscriber A Agreement prohibits use of the Reis Database that is not for the benefit of Subscriber A using login credentials issued to Subscriber A.

70.     Both the Subscriber A Agreement and the Terms of Service are valid and enforceable contracts, binding on the Consultant Defendants.

71.     By entering into these contracts, Consultant Defendants purposefully availed themselves of the privilege of conducting business in New York.

72.     Consultant Defendants materially breached both the Subscriber A Agreement and the Terms of Service by providing their login credentials to Unauthorized User Defendants for the purpose of gaining unauthorized access to the Reis Database.

73.     On information and belief, the Consultant Defendants also used the Reis Database themselves in manners unauthorized by the Subscriber A Agreement, downloading documents from the Reis Database without compensating Reis for this privilege.  This unauthorized use is a material breach of the Subscriber A Agreement.

74.     As a direct and proximate result of the Consultant Defendants' material breach of the Terms of Service and the Subscriber A Agreement, Reis has been harmed and is entitled to monetary damages in an amount to be determined at trial, but at least $3,604,230, exclusive of attorney's fees, costs, interest, and punitive damages.

**Count III**
**Breach of Contract**
**(Unauthorized User Defendants)**

75.     Reis repeats and realleges the allegations of Paragraphs 1–74 of this Complaint as if fully set forth herein.

76.     Use of the Reis Database is governed by and subject to the Terms of Service located on the sign in page of the Reis Database.

77.     At all relevant times, Reis prominently displayed a link to the Terms of Service on the sign in page of the Reis Database.

78.     The Terms of Service is a valid, enforceable contract through which Reis provides authorized users with a limited license to use the Reis Database.  By entering into this contract, the Unauthorized User Defendants agreed to pay fees associated with use of the Reis Database — either on a per item basis or pursuant to a prearranged subscription agreement.

79.     By entering into this contract, Unauthorized User Defendants purposefully availed themselves of the privilege of conducting business in New York.

80.     Unauthorized User Defendants materially breached the Terms of Service by repeatedly accessing and downloading documents from the Reis Database without compensating Reis for this privilege and with knowledge of the Terms of Service.

81.     As a direct and proximate result of Unauthorized User Defendants' material breach of the Terms of Service, Reis has been harmed and is entitled to monetary damages in an amount to be determined at trial, but at least $3,604,230, exclusive of attorney's fees, costs, interest, and punitive damages.

## Count IV
## Conversion and Theft

82.     Reis repeats and realleges the allegations of Paragraphs 1–81 of this Complaint as if fully set forth herein.

83.     Acting in concert with the Consultant Defendants, the Unauthorized User Defendants downloaded 3,624 reports from the Reis Database without paying for them.

84.     In doing so, Defendants exercised unauthorized control and ownership over each downloaded report to the exclusion of Plaintiffs.

85.     As a result, Reis suffered damage in the form of a lost sale for each report taken by the Defendants.

86.     Defendants consumed those reports, used them, and could not return them to Reis.

87.     Defendants have acted in willful disregard of Reis's property rights in its reports.

88.     The value of the reports taken by Defendants was at least $3,604,230.

89.     As a direct and proximate result of Defendants' actions, Reis has suffered and will continue to suffer injury and damage in an amount to be determined at trial, but not less than $3,604,230, exclusive of attorney's fees, costs, interest, and punitive damages.

## Count V
## Misappropriation

90.     Reis repeats and realleges the allegations of Paragraphs 1–89 of this Complaint as if fully set forth herein.

91.     Acting in concert with the Consultant Defendants, the Unauthorized User Defendants downloaded thousands of reports from the Reis Database without paying for them.

92.     Those reports were valuable, novel and original compilations of data used by Reis in its business.

93.     The reports were compiled at considerable expense to Reis and provided Reis with an advantage over its competitors.

94.     As set forth above, Reis did not allow access to the reports without payment or license and protected the reports contractually and technologically from unauthorized access.

95.     Defendants improperly accessed and used the reports for their benefit without authorization by Reis.

96.     As a result, Reis was damaged for each report misappropriated by Defendants.

97.     The value of the reports taken by the Defendants is at least $3,604,230.

98.     Reis has suffered and will continue to suffer injury and damage in an amount to be determined at trial, but not less than $3,604,230, exclusive of attorney's fees, costs, interest, and punitive damages.

<u>Count VI</u>
**Common Law Fraud**
**(Unauthorized User Defendants)**

99.     Reis repeats and realleges the allegations of Paragraphs 1–98 of this Complaint as if fully set forth herein.

100.    Reis brings this alternative count of fraud based Unauthorized User Defendants' intentional misrepresentation of their respective identities each time an Unauthorized User Defendant accessed the Reis Database using login credentials issued to one of the Consultant Defendants or any person other than the Unauthorized User Defendant.

101.    Each time the Unauthorized User Defendants logged on to the Reis Database, they represented to Reis that they were one of the Consultant Defendants using the Reis

Database for the benefit of Subscriber A and were authorized pursuant to a valid license to access the Reis Database using those login credentials. That representation was false each time it was made, and the Unauthorized User Defendants knew it was false.

102.     Reis was damaged by Unauthorized User Defendants' fraud in an amount to be determined at trial, but not less than $3,604,230, exclusive of attorney's fees, costs, interest, and punitive damages.

**Count VII**
**Unjust Enrichment**

103.     Reis repeats and realleges the allegations of Paragraphs 1–102 of this Complaint as if fully set forth herein.

104.     Acting in concert with the Consultant Defendants, the Unauthorized User Defendants have accessed, downloaded, and used $3,604,230 worth of reports from the Reis Database, but have provided no value in return to Reis.

105.     Thus, Defendants have been unjustly enriched at the expense of Reis in an amount to be determined at trial, but at least $3,604,230.

106.     It is against equity and good conscience to permit Defendants to retain the valuable information Reis seeks to recover herein.

107.     Defendants' actions were knowing, intentional, and willful.

108.     Defendants are therefore liable to Reis in unjust enrichment in an amount to be determined at trial, but not less than $3,604,230, exclusive of attorney's fees, costs, interest, and punitive damages.

## Count VIII
## Quantum Meruit

109.     Reis repeats and realleges the allegations of Paragraphs 1–108 of this Complaint as if fully set forth herein.

110.     Defendants have received a substantial economic benefit and competitive edge by virtue of their accessing, downloading, and using proprietary reports from the Reis Database.

111.     Defendants only obtained these benefits because they unlawfully accessed, downloaded, and used proprietary reports from the Reis Database for their own economic and competitive advantage.

112.     It is inequitable and unjust for Defendants to have obtained the benefit of using the Reis Database for their own economic and competitive advantage without justly compensating Reis.

113.     As a direct and proximate result of the Defendants' actions, Reis has suffered and will continue to suffer injury and damage in an amount to be proven at trial, but at least $3,604,230.

114.     Defendants are therefore liable to Reis in quantum meruit in an amount to be determined at trial, but not less than $3,604,230, exclusive of attorney's fees, costs, interest, and punitive damages.

## Count IX
## Aiding and Abetting
## (Consultant Defendants)

115.     Reis repeats and realleges the allegations of Paragraphs 1–114 of this Complaint as if fully set forth herein.

116.    The Consultant Defendants knew of Unauthorized User Defendants' tortious conduct and provided substantial assistance to achieve it. They are therefore liable for aiding and abetting each of the counts against Unauthorized User Defendants sounding in tort.

**Count X
Civil Conspiracy
(All Defendants)**

117.    Reis repeats and realleges the allegations of Paragraphs 1–116 of this Complaint as if fully set forth herein.

118.    The Consultant and Unauthorized User Defendants have conspired to commit tortious acts against Reis and breach Reis's Terms of Service and the Subscriber A Agreement. Among other wrongs, the Consultant and Unauthorized User Defendants have conspired to gain unauthorized access to the Reis Database and stealing Reis's proprietary reports.

119.    The Consultant Defendants agreed, *inter alia*, to have Unauthorized User Defendants use Consultant Defendants' login credentials, knowing that such use violated the Subscriber A Agreement and Reis's Terms of Service and Anti-Piracy Policy.  All Defendants participated in this plan and committed at least one overt act in furtherance of the agreement.

120.    The Consultant and Unauthorized User Defendants are therefore jointly and severally liable for the damages caused by acts committed in furtherance of the conspiracy.

**Relief Requested**

WHEREFORE, Reis respectfully requests that the Court enter judgment in its favor and award the following relief against Defendant:

a.     That the Court award compensatory damages of at least $3,604,230, plus interest and costs;

b.     That the Court award punitive damages in an amount to be determined at trial;

c.     That the Court award Reis its attorney's fees and expenses;

d.     That the Court award Reis such other and further relief as is just and proper under the circumstances.

Dated:  New York, New York
        August 18, 2015

Patterson Belknap Webb & Tyler LLP

By:   /s/ Geoffrey Potter
                     Geoffrey Potter
                     Aron Fischer
                     Scott Caplan

1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000
gpotter@pbwt.com
afischer@pbwt.com
scaplan@pbwt.com

*Attorneys for Plaintiffs*
  *Reis, Inc. and Reis Services, LLC*

24